NOTICE

Decision filed 06/09/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 250287-U

NO. 5-25-0287

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Marion County. |
| | ) | |
| v. | ) | No. 23-DV-49 |
| | ) | |
| JEREMIAH MARTIN, | ) | Honorable |
| | ) | Mark W. Stedelin, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE HACKETT delivered the judgment of the court.
Presiding Justice Cates and Justice Moore[*] concurred in the judgment.

**ORDER**

¶ 1     *Held*:   We affirm the defendant's conviction for domestic battery where the trial evidence was sufficient for a rational trier of fact to find the defendant guilty beyond a reasonable doubt.

¶ 2     Following a bench trial, the defendant, Jeremiah Martin, was convicted of domestic battery (720 ILCS 5/12-3.2(a)(2) (West 2022)) and sentenced to one year of probation. On appeal, the defendant argues that we must reverse his conviction outright where the State failed to prove him guilty beyond a reasonable doubt. For the following reasons, we affirm.

¶ 3                                    I. BACKGROUND

_____
[*]Justice Moore fully participated in the decision prior to his retirement. See *Cirro Wrecking Co. v. Roppolo*, 153 Ill. 2d 6 (1992).

1

¶ 4    On September 22, 2023, the defendant was charged via information with one count of domestic battery, a Class A misdemeanor. On January 25, 2024, the defendant waived his right to a jury trial. At the bench trial on January 23, 2025, the following testimony was adduced.

¶ 5    Dakota N. testified that on September 21, 2023, he was 14 years old and lived in Salem with his sister and mother, Jamie N. The defendant, Jamie's partner of nine years, also lived with them. Although Jamie and the defendant were not married, Dakota referred to the defendant as his stepfather.

¶ 6    Dakota testified that on the evening of the incident, Jamie left the house to pick up dinner from McDonald's. While Jamie was gone, Dakota rode Jamie's bicycle to go talk to the neighbors. When Dakota returned home six minutes later, he jumped off the bike as it was still moving, an action referred to as "ghosting" the bike. The defendant, who was on the porch drinking beer, yelled at Dakota for ghosting the bike and told Dakota to put the bike away in its spot. Dakota put the bike away and walked up the house's front steps with clenched fists. At that point, Jamie arrived back at the house.

¶ 7    Dakota testified that the defendant followed Dakota into the living room, pushed Dakota, and said, "Let's go." Dakota then yelled back, "You want to fight me, let's go." Dakota threw his glasses at the defendant before he and the defendant attempted to wrestle each other to the ground. Dakota was not sure who first made physical contact. Before either could succeed in wrestling the other to the ground, Jamie grabbed the defendant, who was three or four feet away from Dakota. Leaning against Jamie, the defendant lifted his foot and kicked Dakota in the mouth. After the kick, Jamie pulled the defendant outside, and Dakota's sister brought Dakota to his room. Dakota had scratches on his face and pinch marks on his right side.

¶ 8     Jamie N. testified that in the early evening of September 21, 2023, she and the defendant were sitting on the porch talking. The defendant was drinking beer and smoking. According to Jamie, the defendant usually got home from work at around 6 p.m. and drank a 12-pack of beer nightly. The defendant asked Jamie to get him food from McDonald's, so Jamie took her daughter and left while it was still light outside. Jamie estimated that they were gone for 15 minutes. When Jamie returned, she noticed that the defendant had changed out of his work clothes and looked "agitated and puffy." Jamie instantly knew from the defendant's posture that something was wrong. As she arrived, the defendant told Jamie that Dakota had taken her bike and left the house without permission. Dakota then returned, and the defendant told Dakota to put the bike away and go inside. Dakota "ghosted" the bike and let it go into the open garage. The defendant yelled at Dakota about his treatment of the bike and told Dakota to go inside.

¶ 9     As Dakota went up the steps and into the house, the defendant followed him and continued yelling at him. Dakota was not yelling back. Jamie followed "a split second" behind Dakota and the defendant. When she got to the living room, she "saw what looked like [the defendant] going to kick [Dakota]." The defendant was standing on his right leg with his left leg "up off of the ground," as though he "was about to try to kick [Dakota] in the face." Jamie immediately grabbed the defendant and pulled him away from Dakota. When asked whether she witnessed any physical contact between Dakota and the defendant, Jamie stated: "I honestly don't recall the real specifics. What remains is just [the defendant's] leg was up, and I took it as him going to hurt Dakota." On cross-examination, Jamie testified that she did not witness contact being made but did hear a noise. Jamie's daughter took Dakota into the kitchen and called the police. The defendant stayed out on the porch and did not reenter the house. Jamie examined Dakota and observed a scratch near his eye. Dakota's glasses and necklace were broken, and the necklace was on the living room floor.

3

¶ 10    Jamie confirmed that the defendant shared in parental responsibilities with her and disciplined her children "from time to time," but that she had "the final say." Jamie testified that the defendant "always had a very set idea of how the kids should be disciplined." If Jamie disagreed with the defendant, he would tell Jamie that she should not disagree because Dakota would not learn otherwise.

¶ 11    Officer Ryan Meador testified that, on September 21, 2023, he was on duty as a Salem police officer and responded to a domestic disturbance call at 412 South Washington. He arrived at around 6:55 p.m. and walked up to the house. He heard yelling between the defendant and a female. Office Meador knocked on the door, and the defendant answered the door with a beer in his hand. The defendant put the beer on the counter before stepping outside on the patio to speak with Officer Meador. The defendant told Officer Meador that his 14-year-old stepson had not been listening to him, and that they had gotten into a disagreement. At first, the defendant denied touching Dakota at all; later, he stated that he pushed Dakota because Dakota threw his glasses at him. The defendant told Officer Meador that Dakota's necklace was broken because it "had gotten wrapped up in [the defendant's] fingers" when he pushed Dakota. Another officer, Officer King, who had gone inside the residence, then came outside and advised Officer Meador that Dakota had marks on his face consistent with battery. Officer Meador placed the defendant under arrest. Officer Meador observed marks on Dakota's face and saw that Dakota's glasses were broken. Officer Meador took photographs of Dakota's face, right shoulder, broken glasses, and broken necklace. At trial, all of the photographs were admitted into evidence without objection.

¶ 12    At this point, the State rested, and defense counsel moved for a directed verdict, arguing that the witnesses' testimonies were too inconsistent for the State to prove the defendant guilty beyond a reasonable doubt. The trial court denied the motion.

4

¶ 13    The defendant testified that on September 21, 2023, he bought a six-pack of beer on his way home from work. He arrived home and drank on the porch while talking to Jamie. Just after he opened his second beer, Jamie left to get food. At the time, Dakota was grounded for not doing his chores, and Jamie had agreed to this punishment. The defendant testified that he and Jamie had consistent problems with Dakota. While the defendant was still sitting on the porch, Dakota got on Jamie's bike and rode down the street. Dakota did not ask the defendant for permission before leaving. After a couple of minutes, the defendant "yelled at [Dakota] to get his ass home." At that point, Dakota returned home.

¶ 14    Dakota reached the yard, "jumped off the bike[,] and shoved it in the garage," at which point the defendant and Dakota began arguing. Dakota "balled up his fists" and walked up the house steps, and the defendant followed behind. At this point, Jamie arrived back at the house. The defendant and Dakota entered the house and eventually reached the living room. There, the defendant reached out, put his hand on Dakota's shoulder, and said, "Hey, just stop it." Dakota then turned around and swung at the defendant but missed because the defendant leaned back. The defendant then grabbed Dakota by the shoulders. The defendant bent Dakota over and yelled for Jamie to come into the house. Jamie grabbed the defendant's arm and yanked him backwards, at which point Dakota "smacked himself in the face and ripped the glasses off and threw them at" the defendant. Jamie took the defendant to the door, where the defendant yelled at Jamie. The police then arrived.

¶ 15    The defendant was not sure what had happened to the necklace and testified that he did not even know about the necklace until the trial. The defendant denied pinching, hitting, or kicking Dakota. The defendant testified that neither he nor Dakota were on the ground. The defense then rested.

5

¶ 16    In its oral ruling, the trial court described Dakota's testimony as "fairly credible" and "direct"; Jamie's testimony as similarly direct; and Officer Meador's testimony as "direct and credible." The court described the "form and substance" of the defendant's testimony as "fairly credible" and "direct." However, the trial court commented that the defendant's testimony was "entirely inconsistent" with Jamie's and Dakota's testimonies that, at the very least, the defendant's leg was raised in a kicking position. The trial court also noted that the defendant claimed at trial "that he didn't know what happened to the necklace, even though he told the police that his hand got tangled up in the necklace." The trial court concluded that Dakota's testimony was "more credible than the defendant's." The trial court found the defendant guilty of domestic battery.

¶ 17    On February 24, 2025, the defendant filed a motion to vacate judgment and a motion for judgment notwithstanding the verdict, arguing in both that the State had failed to prove him guilty of domestic battery beyond a reasonable doubt. On March 6, 2025, the trial court denied both motions and sentenced the defendant to one year of probation. The defendant appeals.

¶ 18                                II. ANALYSIS

¶ 19    On appeal, the defendant argues that this court must reverse his domestic battery conviction outright where the State failed to prove him guilty beyond a reasonable doubt. Due process protects an accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged. U.S. Const., amend. XIV; Ill. Const. 1970, art. I, § 2. When reviewing the sufficiency of the evidence, the standard is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Cunningham*, 212 Ill. 2d 274, 278-79 (2004); see *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Following a finding of guilt, on

6

review, all reasonable inferences in the record will be made in favor of the State. *Cunningham*, 212 Ill. 2d at 280. So long as *any* rational trier of fact could have found guilt established beyond a reasonable doubt, it is irrelevant on review whether the reviewing court itself believes such guilt was proven. *Jackson*, 443 U.S. at 319.

¶ 20    "When presented with a challenge to the sufficiency of the evidence, it is not the function of this court to retry the defendant." *People v. Collins*, 106 Ill. 2d 237, 261 (1985). The determination of the witnesses' credibility and the weight of their testimony, the resolution of conflicts in the evidence, and the deriving of reasonable inferences from the evidence are within the province of the trier of fact. *People v. Brooks*, 187 Ill. 2d 91, 132 (1999). A reviewing court will not substitute its judgment for that of the trier of fact on these matters. *Id.* However, this deference to the trial court only extends to reasonable conclusions; if a court's conclusion is unreasonable, and "only one conclusion may reasonably be drawn from the record, a reviewing court must draw it even if it favors the defendant." *Cunningham*, 212 Ill. 2d at 280.

¶ 21    To sustain a charge of domestic battery, the State must prove that the defendant knowingly, and without legal justification, made physical contact of an insulting or provoking nature with a family or household member. See 720 ILCS 5/12-3.2(a)(2) (West 2022). While the physical contact must have been of an insulting or provoking nature, it does not need to have caused physical injury. *People v. Green*, 2011 IL App (2d) 091123, ¶ 23.

¶ 22    Here, the defendant challenges only whether the specific physical contact of which he was accused, kicking Dakota in the face, actually occurred. The defendant does not dispute that such contact would have been done knowingly and without legal justification, or that it would have been of an insulting or provoking nature. The defendant similarly does not dispute that Dakota was a family or household member. Therefore, we only consider whether, viewing the evidence in the

light most favorable to the State, any rational trier of fact could have found beyond a reasonable doubt that the defendant kicked Dakota in the face.

¶ 23    Dakota, Jamie, and the defendant all agreed on some of the facts from the incident: the defendant was drinking that evening, the argument concerned Dakota's leaving the house on Jamie's bike and "ghosting" the bike upon his return to the house, the defendant yelled at Dakota for his behavior, the defendant followed Dakota up the steps into the house, Jamie entered the house at some point after Dakota and the defendant, and the altercation ultimately ended when Jamie pulled the defendant away from Dakota.

¶ 24    The defendant and Dakota also agreed that Dakota clenched his fists while walking up the stairs and threw his glasses at the defendant inside the house. Dakota admitted that he did not recall whether he or the defendant first made physical contact. Officer Meador testified that, at the time of the incident, the defendant initially denied any physical contact with Dakota before admitting to pushing Dakota because Dakota threw his glasses at him, and to breaking Dakota's necklace in the push. At trial, however, the defendant never testified about pushing Dakota at any point, including after Dakota threw his glasses at the defendant. The defendant also denied any knowledge about the necklace.

¶ 25    The witnesses' testimonies significantly differ on the critical point of the kick. Dakota testified that the defendant lifted his foot off the ground and kicked Dakota in the mouth. Jamie testified that, although she did not witness contact being made, she heard a noise and saw the defendant's leg lifted off the ground and aimed in a kicking position toward Dakota's face. The defendant was the sole party present during the altercation that did not testify that, at the very least, at some point during the altercation, his foot was raised off the ground and aimed in a kicking position toward Dakota's face.

¶ 26    The trial court, hearing all of the testimony, determined the witnesses as all fairly credible, but ultimately resolved the conflicts in their testimonies against the defendant and assigned more weight to Dakota's testimony than to the defendant's. Since, in a bench trial, the trial court serves as the trier of fact, to make such determinations is well within the court's province. We do not find that the trial court's conclusions were unreasonable, or that the evidence, considered in the light most favorable to the State, was so insufficient that no rational trier of fact could have found the defendant guilty of domestic battery beyond a reasonable doubt. We decline to reweigh the evidence or retry the defendant here.

¶ 27                                    III. CONCLUSION

¶ 28    When considered in the light most favorable to the State, the trial evidence was sufficient for a rational trier of fact to find the defendant guilty of domestic battery beyond a reasonable doubt. The defendant's conviction is affirmed.


¶ 29    Affirmed.